Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

ZAC CETRONE, derivatively on behalf of AMPIO PHARMACEUTICALS, INC.,

     Plaintiff,

     vs.

MICHAEL MACALUSO, THOMAS E. CHILCOTT, DAVID BAR-OR, PHILIP H. COELHO, RICHARD B. GILES, and DAVID R. STEVENS,

     Defendants,

     and

AMPIO PHARMACEUTICALS, INC.,

     Nominal Defendant.

Case No.:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Zac Cetrone ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Ampio Pharmaceuticals, Inc. ("Ampio" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Michael Macaluso, Thomas E. Chilcott, David Bar-Or, Philip H. Coelho, Richard B. Giles, and David R. Stevens (collectively, the "Individual Defendants," and together with the Company, the "Defendants") for breaches of their fiduciary duties as directors

1

and officers of Ampio, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement.  As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ampio, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Ampio's directors and officers starting on December 14, 2017 and continuing through the present (the "Relevant Period").

2.      Ampio is a company primarily focused on developing compounds that decrease inflammation by: (1) inhibiting specific pro-inflammatory compounds by affecting specific pathways at the protein expression and at the transcription level; (2) activating specific phosphatase or depleting available phosphate needed for the inflammation process; and (3) decreasing vascular permeability.

Verified Shareholder Derivative Complaint

3.    The Company has two lead product candidates, which have advanced through late-stage clinical trials in the United States.  One of these product candidates is called "Ampion," which is a biologic intra-articular injection being studied for the treatment of pain due to osteoarthritis of the knee.

4.    Two of the Company's clinical trials for Ampion are called "AP-003-A" and "AP-003-C," respectively.

5.    On August 7, 2018, the Company filed a current report on Form 8-K with the SEC with an attached business disclosure that revealed, among other things, that the United States Food and Drug Administration ("FDA") believed that, as a single trial, the AP-003-A study alone does not appear to provide sufficient evidence of effectiveness to support a Biologics License Application ("BLA")[1] and that the FDA does not consider the AP-003-C trial to be an adequate and well-controlled clinical trial.

6.    On this news, the price of Ampio common stock dropped $2.25 per share, or 78.7%, from the previous day's closing price, closing at $0.61 per share on August 8, 2018.

7.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain internal controls.

8.    Also during the Relevant Period, the Individual Defendants personally made and/or caused the Company to make a series of materially false and misleading

---

[1] A BLA is a request for permission to introduce, or deliver for introduction, a biologic product into interstate commerce.

Verified Shareholder Derivative Complaint

statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) as a single trial, the AP-003-A study alone does not appear to provide sufficient evidence of effectiveness to support a BLA; (2) the Company's AP-003-C trial was not adequate and well-controlled to a level that would satisfy FDA standards; (3) the Company's two pivotal Ampion clinical trials were not successfully completed; and (4) Ampio failed to maintain internal controls.

9.     As a result of the foregoing, the Defendants' public statements were materially false and misleading at all relevant times.

10.     In light of the Individual Defendants' misconduct, which has subjected Ampio, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being defendants in both a securities fraud class action lawsuit pending in this Court and a securities fraud class action lawsuit pending in the United States District Court for the District of Colorado (the "Securities Class Actions"), the need to undertake internal investigations, and losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

Verified Shareholder Derivative Complaint

11.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, the substantial likelihood of the Company's CEO's and CFO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of the Ampio Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations

in this District, or he or she is an individual who is a citizen of California or who has

minimum contacts with this District to justify the exercise of jurisdiction over them.

16.     Venue is proper in this District because Ampio and the Individual

Defendants have conducted business in this District, and Defendants' actions have had

an effect in this District.

## **PARTIES**

### **Plaintiff**

17.     Plaintiff is a current shareholder of Ampio. Plaintiff has continuously held

Ampio common stock at all relevant times. Plaintiff is a citizen of Michigan.

### **Nominal Defendant Ampio**

18.     Ampio is a Delaware corporation with its principal executive offices at 373

Inverness Parkway, Suite 200, Englewood, Colorado 80112. Ampio's shares trade on

the NYSE under the ticker symbol "AMPE."

### **Defendant Macaluso**

19.     Defendant Michael Macaluso ("Macaluso") is the founder of Ampio's

predecessor company, DMI Life Sciences, Inc., and has served as the Company's CEO

since January 2012 and as a Company director since March 2010.  According to the

Company's Schedule 14A filed with the SEC on August 29, 2017 (the "2017 Proxy

Statement"), as of July 31, 2017, Defendant Macaluso beneficially owned 2,836,752

shares of the Company's common stock, which represented 3.7% of the Company's

outstanding common stock.  Given that the price per share of the Company's common

Verified Shareholder Derivative Complaint

stock at the close of trading on July 31, 2017 was $0.53, Macaluso owned over $1.5 million worth of Ampio common stock.

20. For the fiscal year ended December 31, 2017, Defendant Macaluso received $573,016 in compensation from the Company. This included $300,000 in salary, a $5,000 bonus, and $268,016 in option awards.

21. The Company's 2017 Proxy Statement stated the following about Defendant Macaluso:

> *Michael Macaluso*[2] founded Life Sciences and has been a member of the board of directors of Life Sciences, our predecessor, since its inception. Mr. Macaluso has also been a member of our Board of Directors since the merger with Chay Enterprises in March 2010 and our Chief Executive Officer since January 9, 2012. Mr. Macaluso was appointed president of Isolagen, Inc. (AMEX: ILE) and served in that position from June 2001 to August 2001, when he was appointed chief executive officer. In June 2003, Mr. Macaluso was re-appointed as president of Isolagen and served as both chief executive officer and president until September 2004. Mr. Macaluso also served on the board of directors of Isolagen from June 2001 until April 2005. From October 1998 until June 2001, Mr. Macaluso was the owner of Page International Communications, a manufacturing business. Mr. Macaluso was a founder and principal of International Printing and Publishing, a position Mr. Macaluso held from 1989 until 1997, when he sold that business to a private equity firm. Mr. Macaluso's experience in executive management and marketing within the pharmaceutical industry, monetizing company opportunities, and corporate finance led to the conclusion of our Board of Directors that he should serve as a director of our company in light of our business and structure.

---

[2] Emphasis in original unless otherwise noted throughout.

22.    Upon information and belief, Defendant Macaluso is a citizen of Colorado.

**Defendant Chilcott**

23.    Defendant Thomas E. Chilcott ("Chilcott") has served as the Company's CFO since August 2017.  According to the 2017 Proxy Statement, as of July 31, 2017, Defendant Chilcott beneficially owned 58,333 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on July 31, 2017 was $0.53, Chilcott owned over $30,916 worth of Ampio common stock.

24.    For the fiscal year ended December 31, 2017, Defendant Chilcott received $391,844 in compensation from the Company.  This included $166,458 in salary, a $55,000 bonus, and $170,386 in option awards.

25.    The Company's 2017 Proxy Statement stated the following about Defendant Chilcott:

*Thomas E. Chilcott, III* has been employed by us since January 2017. Prior to joining us, Mr. Chilcott, served as the President and Chief Financial Officer of Chilcott Consulting Group from September 2006 to December 2016. Mr. Chilcott began his career as an auditor with KMPG Peat Marwick. He graduated from Villanova University with a BS of Administration in Accountancy and is a Certified Public Accountant in good standing.

26.    Upon information and belief, Defendant Chilcott is a citizen of Colorado.

**Defendant Bar-Or**

27.     Defendant David Bar-Or ("Bar-Or") served as the Company's Chief Scientific Officer from March 2010 until his retirement on August 29, 2018, and has served as a Company director since March 2010.  He is also the founder of Ampio. According to the 2017 Proxy Statement, as of July 31, 2017, Defendant Bar-Or beneficially owned 1,200,000 shares of the Company's common stock, which represented 1.5% of the Company's outstanding common stock.  Given that the price per share of the Company's common stock at the close of trading on July 31, 2017 was $0.53, Bar-Or owned $636,000 worth of Ampio common stock.

28.     For the fiscal year ended December 31, 2017, Defendant Bar-Or received $351,728 in compensation from the Company.  This included $300,000 in salary, a $5,000 bonus, and $46,728 in option awards.

29.     The Company's 2017 Proxy Statement stated the following about Defendant Bar-Or:

> *David Bar-Or, M.D.*, has served as our chief scientific officer since March 2010. Dr. Bar-Or also served as our chairman of the Board from March 2010 until May 2010. From April 2009 until March 2010, he served as chairman of the board and chief scientific officer of Life Sciences. Dr. Bar-Or is currently the director of Trauma Research at Swedish Medical Center, Englewood, Colorado, St. Anthony's Hospital, Lakewood, Colorado, Penrose Hospital in Colorado Springs, Research Medical Center in Kansas City, Missouri and The Medical Center of Plano, Plano, Texas. He is also the Director of stoke [sic] research at Swedish Medical Center comprehensive stroke center. Dr. Bar-Or is the founder of Ampio Pharmaceuticals Inc. Dr. Bar-Or is principally responsible for all patented and proprietary technologies acquired by us from BioSciences in April 2009 and for all patents issued and applied for since then, having been issued over 270 patents and having filed or co-filed almost 120 patent applications. Dr. Bar-Or

9

has authored or co-authored over 145 peer-reviewed journal articles and several book chapters. He is the recipient of the Gustav Levi Award from the Mount Sinai Hospital, New York, New York, the Kornfeld Award for an outstanding MD Thesis, the Outstanding Resident Research Award from the Denver General Hospital, and the Outstanding Clinician Award from the Denver General Medical Emergency Resident Program. Dr. Bar-Or received his medical degree from The Hebrew University, Hadassah Medical School, Jerusalem, Israel, following which he completed a biochemistry fellowship at Hadassah Hospital under Professor Alisa Gutman and undertook post-graduate work at Denver Health Medical Center, specializing in emergency medicine, a discipline in which he is board certified. He completed the first research fellowship in Emergency Medicine at Denver Health Medical Center under the direction of Professor Peter Rosen. Among other experience, qualifications, attributes and skills, Dr. Bar-Or's medical training, extensive involvement and inventions in researching and developing our product candidates, and leadership role in his hospital affiliations led to the conclusion of our Board of Directors that he should serve as a director of our company in light of our business and structure.

30.     Upon information and belief, Defendant Bar-Or is a citizen of Colorado.

**Defendant Coelho**

31.     Defendant Philip H. Coelho ("Coelho") has served as a Company director since April 2010, and serves as chairman of the Compensation Committee, chairman of the Nominating and Governance Committee, and as a member of the Audit Committee.  According to the 2017 Proxy Statement, as of July 31, 2017, Defendant Coelho beneficially owned 663,781 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on July 31, 2017 was $0.53, Coelho owned over $351,803 worth of Ampio common stock.

32.     For the fiscal year ended December 31, 2017, Defendant Coelho received $164,553 in compensation from the Company.  This included $110,500 in fees earned or paid in cash, $34,053 in option awards, and $20,000 in stock awards.

33.     The Company's 2017 Proxy Statement stated the following about Defendant Coelho:

*Philip H. Coelho* has served as a member of our Board of Directors since April 2010. Mr. Coelho is the Co-Founder and CTO of SynGen Inc., a firm inventing and commercializing products that harvest stem and progenitor cells derived from a donor or the patient's own body to treat human disease. Prior to founding SynGen Inc. in October 2009, Mr. Coelho was the President and CEO of PHC Medical, Inc., a consulting firm, from August 2008 through October 2009. From August 2007 through May 2008, Mr. Coelho served as the Chief Technology Architect of ThermoGenesis Corp., a medical products company he founded in 1986 that focused on the regenerative medicine market. From 1989 through July 2007, he was Chairman and Chief Executive Officer of ThermoGenesis Corp. Mr. Coelho served as Vice President of Research & Development of ThermoGenesis from 1986 through 1989. Mr. Coelho has been in the senior management of high technology consumer electronic or medical device companies for over 30 years. He was President of Castleton Inc. from 1982 to 1986, and President of ESS Inc. from 1971 to 1982. Mr. Coelho also serves as a member of the board of directors of NASDAQ-listed company, Catalyst Pharmaceuticals Partners, Inc. (CPRX) (since October 2002), and served as a member of the Board of Directors of NASDAQ-listed Mediware Information Systems, Inc. (MEDW) (from December 2001 until July 2006, and commencing again in May 2008 until it was sold in December 2012). Mr. Coelho received a B.S. degree in thermodynamic and mechanical engineering from the University of California, Davis and has been awarded more than 30 U.S. patents in the areas of cell cryopreservation, cryogenic robotics, cell selection, blood protein harvesting and surgical homeostasis. Mr. Coelho's long tenure as a chief executive officer of a medical device company, as director of a public pharmaceutical company, prior and current public company board experience, and knowledge of corporate finance and governance as an executive and director, as well as his demonstrated

success in developing patented technologies, led to the conclusion of our Board of Directors that he should serve as a director of our company in light of our business and structure.

34.     Upon information and belief, Defendant Coelho is a citizen of California.

**Defendant Giles**

35.     Defendant Richard B. Giles ("Giles") has served as a Company director since August 2010, and serves as chairman of the Audit Committee and as a member of the Compensation Committee and the Nominating and Governance Committee. According to the 2017 Proxy Statement, as of July 31, 2017, Defendant Giles beneficially owned 970,848 shares of the Company's common stock, which represented 1.2% of the Company's outstanding common stock.  Given that the price per share of the Company's common stock at the close of trading on July 31, 2017 was $0.53, Giles owned over $514,549 worth of Ampio common stock.

36.     For the fiscal year ended December 31, 2017, Defendant Giles received $153,553 in compensation from the Company.  This included $99,500 in fees earned or paid in cash, $34,053 in option awards, and $20,000 in stock awards.

37.     The Company's 2017 Proxy Statement stated the following about Defendant Giles:

*Richard B. Giles* has served as a member of our Board of Directors since August 2010. Mr. Giles is the Chief Financial Officer of Ludvik Electric Co., an electrical contractor headquartered in Lakewood, Colorado, a position he has held since 1985. Ludvik Electric is a private electrical contractor with 2016 revenues of over $70 million that has completed electrical contracting projects throughout the United States, South Africa and Germany. As CFO and Treasurer of Ludvik Electric,

Mr. Giles oversees accounting, risk management, financial planning and analysis, financial reporting, regulatory compliance, and tax-related accounting functions. He serves also as the trustee of Ludvik Electric Co.'s 401(k) plan. Prior to joining Ludvik Electric, Mr. Giles was an audit partner for three years with Higgins Meritt & Company, then a Denver, Colorado CPA firm, and during the preceding nine years he was an audit manager and a member of the audit staff of Price Waterhouse, one of the legacy firms which now comprises PricewaterhouseCoopers. While with Price Waterhouse, Mr. Giles participated in a number of public company audits, including one for a leading computer manufacturer. Mr. Giles received a B.S. degree in accounting from the University of Northern Colorado. He is a member of the American Institute of Certified Public Accountants, Colorado Society of Certified Public Accountants and the Construction Financial Management Association. Mr. Giles' experience in executive financial management, accounting and financial reporting, and corporate accounting and controls led to the conclusion of our Board of Directors that he should serve as a director of our company in light of our business and structure.

38.     Upon information and belief, Defendant Giles is a citizen of Colorado.

**Defendant Stevens**

39.     Defendant David R. Stevens ("Stevens") has served as a Company director since June 2011, and serves as a member of the Audit Committee, the Compensation Committee, and the Nominating and Governance Committee. According to the 2017 Proxy Statement, as of July 31, 2017, Defendant Stevens beneficially owned 313,289 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on July 31, 2017 was $0.53, Stevens owned over $166,043 worth of Ampio common stock.

Verified Shareholder Derivative Complaint

40.     For the fiscal year ended December 31, 2017, Defendant Stevens received $138,053 in compensation from the Company. This included $84,000 in fees earned or paid in cash, $34,053 in option awards, and $20,000 in stock awards.

41.     The Company's 2017 Proxy Statement stated the following about Defendant Stevens:

> *David R. Stevens, Ph.D.* has served as a member of our Board of Directors since June 2011. Dr. Stevens is currently a board member of Cetya, Inc., a privately-held development stage pharmaceutical company and of Micro-Imaging Solutions, LLC, a private medical device company. He has served on the boards of several other public and private life science companies, including Cedus, Inc., (2006-2014), Poniard Pharmaceuticals, Inc. (2006-2012), Aqua Bounty Technologies, Inc. (2002-2012), and Smart Drug Systems, Inc. (1999-2006), and was an advisor to Bay City Capital from 1999-2006. Dr. Stevens was previously President and CEO of Deprenyl Animal Health, Inc., a public veterinary pharmaceutical company, from 1990 to 1998, and Vice President, Research and Development, of Agrion Corp., a private biotechnology company, from 1986 to 1988. He began his career in pharmaceutical research and development at the former Upjohn Company, where he contributed to the preclinical evaluation of Xanax and Halcion. Dr. Stevens received B.S. and D.V.M. degrees from Washington State University, and a Ph.D. in comparative pathology from the University of California, Davis. He is a Diplomate of the American College of Veterinary Pathologists. Dr. Stevens has worked in the pharmaceutical and biotechnology industries since 1978. Dr. Stevens' experience in executive management in the pharmaceutical industry, and knowledge of the medical device industry led to the conclusion of our Board of Directors that he should serve as a director of our company in light of our business and structure.

42.     Upon information and belief, Defendant Stevens is a citizen of Colorado.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

43.    By reason of their positions as officers, directors, and fiduciaries of Ampio and because of their ability to control the business and corporate affairs of Ampio, the Individual Defendants owed Ampio and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Ampio in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Ampio and its shareholders so as to benefit all shareholders equally.

44.    Each director and officer of the Company owes to Ampio and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

45.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ampio, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

46.    To discharge their duties, the officers and directors of Ampio were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

47.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and

15

administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Ampio, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Ampio's Board at all relevant times.

48.   As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

49.   To discharge their duties, the officers and directors of Ampio were required to exercise reasonable and prudent supervision over the management, policies,

practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Ampio were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Ampio's own Code of Business Conduct and Ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Ampio conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Ampio and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Ampio's operations would comply with all applicable laws and Ampio's financial statements and regulatory filings

17

filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

50.     Each of the Individual Defendants further owed to Ampio and the shareholders the duty of loyalty requiring that each favor Ampio's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

51.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Ampio and were at all times acting within the course and scope of such agency.

Verified Shareholder Derivative Complaint

52.     Because of their advisory, executive, managerial, and directorial positions with Ampio, each of the Individual Defendants had access to adverse, non-public information about the Company.

53.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Ampio.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

54.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

55.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

56.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Ampio was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

57.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

58.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Ampio, and was at all times acting within the course and scope of such agency.

Verified Shareholder Derivative Complaint

## AMPIO'S CODE OF BUSINESS CONDUCT AND ETHICS

59.     Ampio's Code of Business Conduct and Ethics (the "Code of Conduct") provides that it "sets out basic principles to guide all directors, officers and employees of Ampio Pharmaceuticals, Inc. and its subsidiaries," and "[a]ll directors, officers and employees of Ampio must conduct themselves accordingly and seek to avoid even the appearance of improper behavior."

60.     The Code of Conduct provides, as to "Compliance With Applicable Laws, Rules and Regulations," that:

> Obeying the law is the foundation on which Ampio's ethical standards are built. You must comply with applicable laws, rules and regulations. Although you are not expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors or other appropriate personnel.

61.     The Code of Conduct provides, as to "Public Disclosure of Information," that:

> The federal securities laws require Ampio to disclose certain information in various reports that the Company must file with or submit to the SEC. In addition, from time to time, Ampio makes other public communications, such as issuing press releases.
>
> Ampio expects all directors, officers and employees who are involved in the preparation of SEC reports or other public documents to ensure that the information disclosed in those documents is complete, fair, accurate, timely and understandable.
>
> To the extent that you reasonably believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should report those concerns to the Chair of Ampio's Audit Committee.

62.     The Code of Conduct provides, as to "Record-Keeping," that:

Ampio requires honest and accurate recording and reporting of information in order to make responsible business decisions and to comply with the law. For example, employees who must report their hours worked should only report the true and actual number of hours worked (whether for purposes of individual pay or for purposes of reporting such information to customers). Ampio also requires each director and employee to disclose any transaction or arrangement among such individual or any family member or affiliated entity of such individual, on the one hand, and any other director, employee or any family member or affiliated entity of such other individual, on the other hand, that in any way relates to or arises out of such individual's professional or working relationship with Ampio. Many employees regularly use business expense accounts, which must be documented and recorded accurately in accordance with the Company's policies. If you are not sure whether you may seek reimbursement for a certain expense, ask your supervisor or the Chief Financial Officer. All of Ampio's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect Ampio's transactions and must conform both to applicable legal requirements and to Ampio's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless expressly permitted by applicable law or regulation and the Chief Financial Officer is informed by you in writing of the maintenance of such funds or assets.

63.     The Code of Conduct provides, as to "Reporting Illegal or Unethical Behavior," that:

You are encouraged to talk to supervisors or other appropriate personnel about observed illegal or unethical behavior or when in doubt about the best course of action in a particular situation. Any employee who suspects a violation of this Code, or any law or regulation, should bring the matter to the attention of the Chair of the Audit Committee or the Outside Counsel as soon as possible. It is the policy of Ampio not to allow retaliation for reports of misconduct by others made in good faith by employees. You are required by Company policy to cooperate in internal investigations of misconduct. You may, on an anonymous basis, submit a good-faith concern regarding questionable accounting or auditing matters without fear of dismissal or retaliation of any kind by contacting the Chair of the Audit Committee. Contact information

is set forth in the Employee Handbook, on the Company's web site, and in the Company's proxy statements filed with the SEC. You may also report, on an anonymous basis, any violations of this Code, or any law or regulation, through the Company's whistleblower hotline (www.intouchwebsite.com/Ampio) (the "Whistleblower Hotline").

64.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement.  Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports and to report illegal and unethical behavior.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

65.     Ampio is a company primarily focused on developing compounds that decrease inflammation by: (1) inhibiting specific pro-inflammatory compounds by affecting specific pathways at the protein expression and at the transcription level; (2) activating specific phosphatase or depleting available phosphate needed for the inflammation process; and (3) decreasing vascular permeability.

66.     The Company has two lead product candidates, which have advanced through late-stage clinical trials in the United States.  One of these product candidates

Verified Shareholder Derivative Complaint

is Ampion, a biologic intra-articular injection being studied for the treatment of pain due to osteoarthritis of the knee.

67.     AP-003-A and AP-003-C are two pivotal clinical trials for Ampion.

**Materially False and Misleading Statements Issued During the Relevant Period**

***December 14, 2017 Press Release***

68.     On December 14, 2017, the Company issued a press release reporting positive results for both primary and secondary endpoints of Ampio's Phase 3 trial of Ampion in severe osteoarthritis of the knee.  The press release stated, in relevant part:

- Primary endpoint of OMERACT-OARSI responder rate at 12 weeks achieved statistical significance (p < 0.001)

- Ampion™ is the first therapy indicated for signs and symptoms for severe osteoarthritis of the knee and will address a significant treatment gap

* * *

**ENGLEWOOD,    Colo.,    December    14,    2017** — Ampio Pharmaceuticals, Inc. (NYSE MKT: AMPE) today reported that the Phase 3 clinical trial of Ampion™ met its primary endpoint with 71% of Ampion™ treated patients meeting the OMERACT-OARSI responder criteria, which exceeds the physician reported threshold of 30% for a meaningful treatment in severe osteoarthritis of the knee (p < 0.001). Responders experienced, on average a 53% decrease in pain as measured by WOMAC A and a 50% improvement in function as measured by WOMAC C and a 45% improvement in quality of life as measured by Patient Global Assessment (PGA). In the secondary endpoints, Ampion™ treated patients achieved statistical significance in a composite endpoint of pain and function from baseline in both categories at 12 weeks (p < 0.001), which was supported by an increase in quality of life as measured by patient global assessment (PGA) (p < 0.001). When treated with Ampion™ (n=144), patients experienced

significant improvement in a composite endpoint of pain and function compared to all KL 4 saline-treated patients (n=206) in Ampion™ phase 3 clinical trials (p < 0.001).

If approved, Ampion™ would be the first intra-articular injection to treat the signs and symptoms of patients with severe osteoarthritis of the knee (Kellgren-Lawrence x-ray grade 4).  In order to support a label for signs and symptoms, Ampion™ was asked to demonstrate clinical efficacy in a composite response of pain, function and be supported by quality of life.

69.    The press release further touted study results, stating, in relevant part:

Ampion™ was well tolerated with treatment-emergent adverse events (TEAEs) comparable to those of placebo in all single-injection studies of Ampion™. There were no drug-related serious TEAEs associated with the Ampion™ arm. The safety and tolerability profile of Ampion™ is consistent with previous studies.  To date, Ampion™ has been given to over 900 patients with no reported drug-related serious TEAEs.

Ampio plans to present a more detailed analysis of the Phase 3 and pooled data at an upcoming scientific meeting as well as submission for publication.

"We are very pleased with the positive Phase 3 data as we believe that Ampion™ will address an unmet medical need, providing severely diseased patients a non-opioid option that not only reduces pain, but also improves function and quality of life in a meaningful way" said Michael Macaluso, Chairman and CEO, Ampio Pharmaceuticals. "We are hopeful that Ampion™ will serve as a safe and effective treatment for an incurable, progressive disease that afflicts 21 million people in the U.S. and over 200 million people worldwide who suffer from osteoarthritis. We look forward to working closely with the U.S. Food and Drug Administration (FDA) as we prepare to submit our Biologics License Application (BLA) for Ampion™."

***January 8, 2018 Form 8-K***

Verified Shareholder Derivative Complaint

70.    On January 8, 2018, the Company filed a current report on Form 8-K which attached a slide deck updating the investing public on the Company's progress, containing information to be presented at the J.P. Morgan Healthcare Conference, which Ampio described as "the largest and most informative healthcare investment symposium in the industry."

71.    The slide deck notes that the FDA "requires 2 pivotal trials in support of a BLA submission" and that the FDA "designated AP-003-A as a pivotal trial in support of a BLA for Ampion."  Moreover, the slide deck notes that the "[r]ecent AP-003-C study serves as the second pivotal trial in support of BLA[.]"

72.    The slide deck contains the following slide providing an "Executive Summary" of the Company's presentation:

Executive Summary

- Ampion™ is a novel biologic set to address an unmet medical need and significant treatment gap in severe osteoarthritis of the knee (OAK)
  - FDA acknowledged there are no licensed or approved therapies to address this population
- Ampion has successfully completed two pivotal Phase 3 trials for the signs and symptoms severe OAK
  - Pivotal trial design examined response in pain, function and patient global assessment
- Potential product label addresses pain, function and patient global assessment
  - Clinical results show that treatment with Ampion results in a 71% responder rate in a composite endpoint of pain, function and quality of life
- Ampion is safe and well tolerated and is being developed for both short-term and continuous long-term use
  - Safety supported by single and multiple-injection studies in over 2,000 patients
  - FDA-approved Human Serum Albumin (HSA) is the sole starting material
- Ampion is the first therapy to consistently demonstrate significant, safe and meaningful improvement in all core OAK efficacy measurements for severe OAK
- Ampion is a platform therapy and is anticipated to achieve blockbuster potential in the US

Ampio
PHARMACEUTICALS
2

73.     The slide deck also contained the following slide touting Ampion as a "first-in-class, injectable biologic treatment":

Verified Shareholder Derivative Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Ampion is a first-in-class, injectable biologic treatment for the signs and symptoms of severe OA of the knee and has successfully completed two pivotal studies**

* Ampion is a low molecular weight (<5 kDa) ultra filtrate of 5% commercial human serum albumin for the treatment of signs and symptoms of severe OAK
  – Single 4mL intra-articular injection with demonstrated efficacy at 12 weeks in multiple clinical studies
* Ampion is the first drug to demonstrate significant reduction in pain as well as improvement in function and patient global assessment in severe OAK
* Ampion has successfully completed two pivotal studies required for BLA submission:
  ✓ **AP-003-A (Phase 3 single injection)** – single dose of Ampion demonstrated statistically significant pain reduction vs. saline at 12 weeks across all OAK severities
    – *"Upon review of the dataset received on November 5, 2013, FDA concludes that Study AP-003-A can be considered as one of the two 'pivotal' trials required in support of a BLA." – FDA Minutes Nov. 2013*
  ✓ **AP-003-C (Phase 3 single injection)** – single dose of Ampion demonstrated statistically significant effect and met primary endpoint with 71% of patients meeting OMERACT-OARSI responder criteria
    – AP-003-C serves as a second statistically significant pivotal study for BLA submission
* Ampio has a clear path to approval and incorporated FDA guidance when designing AP-003-C to maximize regulatory and commercial success
* Novel MOA of Ampion biologic reduces pain signaling, inflammation and is involved in the promotion of healing
* Safe and well tolerated with no drug-related serious adverse events
  – Most common AE's include: arthralgia injection site pain, headache, joint stiffness

**Throughout its clinical development history, Ampion has demonstrated:**

| | | |
|---|---|---|
| ✓ **Consistent patient outcomes across all trials** | ✓ **Safe and well tolerated** | ✓ **High relative efficacy in severe patients** |



11

Verified Shareholder Derivative Complaint

74.     The slide deck noted that "Ampion has completed two pivotal studies required for FDA filing as well as several additional studies supporting efficacy," and provided, in relevant part:

Verified Shareholder Derivative Complaint

1
2
3
4      75.    The slide deck also stated that AP-003-C "demonstrated statistically
5  significant effect," providing, in relevant part:
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



22
23
24
25
26
27
28

Verified Shareholder Derivative Complaint

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

76.     The slide deck further noted that AP-003-A and AP-003-C "provide two statistically significant clinical trials for BLA submission," providing, in relevant part:





31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

77.    The slide deck further included a slide stating that "Ampion has consistently demonstrated significant [Osteoarthritis Research Society International criteria] response across all trials that exceed minimum clinically meaningful threshold," and provided, in relevant part:

Verified Shareholder Derivative Complaint



78.    The slide deck provided the following slide in conclusion:

Verified Shareholder Derivative Complaint

**Conclusion**

- Ampion™ is a novel biologic set to address an unmet medical need and significant treatment gap in severe osteoarthritis of the knee (OAK)
  - FDA acknowledged there are no licensed or approved therapies to address this population
- Ampion has successfully completed two pivotal Phase 3 trials for the signs and symptoms severe OAK
  - Pivotal trial design examined response in pain, function and patient global assessment
- Potential product label addresses pain, function and patient global assessment
  - Clinical results show that treatment with Ampion results in a 71% responder rate in a composite endpoint of pain, function and quality of life
- Ampion is safe and well tolerated and is being developed for both short-term and continuous long-term use
  - Safety supported by single and multiple-injection studies in over 2,000 patients
  - FDA-approved Human Serum Albumin (HSA) is the sole starting material
- Ampion is the first therapy to consistently demonstrate significant, safe and meaningful improvement in all core OAK efficacy measurements for severe OAK
- Ampion is a platform therapy and is anticipated to achieve blockbuster potential in the US

Ampio
PHARMACEUTICALS   27

### March 6, 2018 Form 10-K

79.    On March 6, 2018, Ampio filed an annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2017 (the "2017 10-K"), which was signed by Defendants Macaluso, Chilcott, Bar-Or, Coelho, Giles, and Stevens.

80.    The 2017 10-K touted positive results for the Company's AP-003-A and AP-003-C trials, stating, in relevant part:

### SPRING Pivotal Trial (AP-003-A)

In the second half of 2013, we announced the results of our positive single injection Phase III pivotal trial, the SPRING study. This study of Ampion focused on the treatment of pain due to osteoarthritis of the knee. The results of this study establish the safety and efficacy of Ampion for reduction of pain due to OA of the knee at 12 weeks after a single intra-articular injection. The SPRING study was a U.S. multicenter, randomized, double-blind, vehicle controlled trial. Three

34

hundred twenty-nine patients were randomized to receive one of two doses (4 mL or 10 mL) of Ampion or corresponding saline control via intra-articular injection. Both doses of Ampion, 4 mL and 10 mL, showed a statistically significant reduction in pain compared to the control, and there were no significant differences between the efficacy of the two Ampion doses. As such, the lowest required dose, 4 mL, was selected as the optimal dose. Patients who received Ampion experienced, on average, greater than a 40% reduction in pain from baseline at 12 weeks. Patients who received Ampion also showed a significant improvement in function and quality of life (quality of life was assessed using the Patient Global Assessment, or PGA) compared to patients who received saline control at 12 weeks. Furthermore, the trial included severely diseased patients (defined as Kellgren-Lawrence IV). From this patient population, those patients who received Ampion had a significantly greater reduction in pain than those who received the saline control. Ampion was well tolerated with minimal adverse events, or AEs, reported across Ampion and saline groups in the study. There were no drug-related serious adverse events, or SAEs.

* * *

*AP-003-C*

In December 2017, we reported positive results for both the primary and secondary endpoints of our confirmatory single injection Phase III clinical trial of 168 patients. The 12-week study evaluated the responder rate of Ampion-treated patients as defined by the Osteoarthritis Research Society International ("OARSI") Standing Committee for Clinical Trials Response Criteria Initiative (OMERACT), which included pain, function, and patient global assessment in support of a label for the treatment of the signs and symptoms of severe OAK. Ampion met its primary endpoint with 71% of Ampion treated patients meeting the OMERACT-OARSI responder criteria, which exceeds the physician reported threshold of 30% for a meaningful treatment in severe osteoarthritis of the knee. Responders experienced, on average, a 53% decrease in pain as measured by WOMAC A and a 50% improvement in function as measured by WOMAC C and a 45% improvement in quality of life as measured by Patient Global Assessment (PGA). In the secondary endpoints, Ampion treated patients achieved statistical significance in a composite endpoint of pain and function from baseline in both categories at 12 weeks, which

was supported by an increase in quality of life as measured by patient global assessment (PGA). When treated with Ampion, patients experienced significant improvement in a composite endpoint of pain and function compared to all severely diseased saline-treated patients in historical Ampion phase III clinical trials. We believe this data supports Ampion's ability to address an unmet medical need and provide patients with a meaningful, non-opioid treatment that improves pain, function and quality of life.

81.     The 2017 10-K additionally stated that Ampio's "disclosure controls and procedures as of the end of the period covered by this report were effective."

82.     Attached to the 2017 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 signed by Defendants Macaluso and Chilcott, attesting to the accuracy of the 2017 10-K.

**The Truth Emerges**

***August 7, 2018 Form 8-K***

83.     On August 7, 2018, the Company filed a Form 8-K with an attachment announcing "Updated Business Disclosures" concerning its AP-003-A and AP-003-C trials.  Specifically, the attachment to the Form 8-K stated that the FDA believed that as a single trial the AP-003-A study alone does not appear to provide sufficient evidence of effectiveness to support a BLA, and that the FDA does not consider the AP-003-C trial to be an adequate and well-controlled clinical trial.  The attachment to the Form 8-K stated, in relevant part:

With respect to FDA review of Ampion and our completed and ongoing clinical trials, including the AP-003-A and AP-003-C trials, we have been and expect to continue to be engaged in meetings and correspondence with the FDA about the product, its manufacturing, and

36

the preclinical and clinical testing necessary to support Ampion's safety and efficacy. We met with the FDA in July 2018 and have received a letter in response thereto. In the letter, the FDA stated that it considers the AP-003-A trial to be an adequate and well-controlled clinical trial that provides evidence of effectiveness of Ampion and can contribute to the substantial evidence of effectiveness necessary for approval of a BLA, but that as a single trial the AP-003-A study alone does not appear to provide sufficient evidence of effectiveness to support a BLA. Despite our belief that the APC-003-C trial design was based on FDA guidance and feedback and consistent with FDA precedent for similar products (in intended use, in origin, and in regulatory pathway), which we reiterated with the FDA multiple times, the FDA does not consider the AP-003-C trial to be an adequate and well-controlled clinical trial. The FDA recommended that we perform an additional randomized trial with a concurrent control group and that we request a Special Protocol Assessment to obtain FDA concurrence of the trial design before beginning the study. We plan to continue to discuss with the FDA the necessity of conducting this additional trial, as we believe the current body of data is sufficient to submit the BLA.

84.     On this news, the price of Ampio common stock dropped $2.25 per share, or 78.7%, from the previous day's closing price, closing at $0.61 per share on August 8, 2018.

85.     The statements referenced in ¶¶ 68-69 and 71-82 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) as a single trial, the AP-003-A study alone does not appear to provide sufficient evidence of effectiveness to support a BLA; (2) the Company's AP-003-C trial was not adequate and well-controlled to a level that would satisfy FDA standards; (3) the Company's two pivotal Ampion clinical trials were not successfully completed; and (4) Ampio failed to maintain internal controls.

86.    As a result of the foregoing, the Defendants' public statements were materially false and misleading at all relevant times.

## DAMAGES TO AMPIO

87.    As a direct and proximate result of the Individual Defendants' conduct, Ampio is losing and expending many millions of dollars.

88.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO, and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

89.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

90.    As a direct and proximate result of the Individual Defendants' conduct, Ampio has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

91.    Plaintiff brings this action derivatively and for the benefit of Ampio to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ampio, unjust

Verified Shareholder Derivative Complaint

enrichment, waste of corporate assets, abuse of control, and gross mismanagement, as well as the aiding and abetting thereof.

92.     Ampio is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

93.     Plaintiff is, and has been at all relevant times, a shareholder of Ampio. Plaintiff will adequately and fairly represent the interests of Ampio in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

94.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

95.     A pre-suit demand on the Board of Ampio is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five individuals: Defendants Macaluso, Bar-Or, Coelho, Giles, and Stevens (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to three of the five directors that were on the Board at the time this action was commenced.

96.     Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders

Verified Shareholder Derivative Complaint

them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

97.     In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

98.     Additional reasons that demand on Defendant Macaluso is futile follow. Defendant Macaluso is the founder of Ampio's predecessor company and has served as Ampio's CEO since January 2012 and as a Company director since March 2010.  Thus, as the Company admits in the 2017 Proxy Statement, he is a non-independent director. Ampio provides Defendant Macaluso with his principal occupation, and he receives handsome compensation, including $573,016 in 2017.  Defendant Macaluso was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing public statements, some of which he personally made statements in or signed.  His large Company stock holding, worth over $1.5 million before the fraud was exposed, reveals his interest in keeping the company' stock price as high as possible.  As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's

engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Macaluso is a defendant in the Securities Class Actions. For these reasons, too, Defendant Macaluso breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

99.    Additional reasons that demand on Defendant Bar-Or is futile follow. Defendant Bar-Or is the Company's founder, and as a Company director since March 2010. Defendant Bar-Or also served as Ampio's Chief Scientific Officer from March 2010 to his retirement on August 29, 2018. Thus, as the Company admits in the 2017 Proxy Statement, he is a non-independent director.   He receives handsome compensation, including $351,728 in 2017.  His large Company stock holding, worth $636,000 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  As a trusted Company officer and long-time director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Defendant Bar-Or signed, and thus personally made the false and misleading statements in, the 2017 10-K referenced herein.  For these reasons, too, Defendant Bar-Or breached his fiduciary duties, faces a

41

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

100. Additional reasons that demand on Defendant Coelho is futile follow. Defendant Coelho has served as a Company director since April 2010, and serves as chairman of the Compensation Committee, chairman of the Nominating and Governance Committee, and as a member of the Audit Committee. He receives handsome compensation, including $164,553 in 2017. His large Company stock holding, worth over $351,803 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted and long-time director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Coelho signed, and thus personally made the false and misleading statements in, the 2017 10-K referenced herein. For these reasons, too, Defendant Coelho breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

101. Additional reasons that demand on Defendant Giles is futile follow. Defendant Giles has served as a Company director since August 2010, and serves as chairman of the Audit Committee and as a member of the Compensation Committee and the Nominating and Governance Committee. He receives handsome compensation,

Verified Shareholder Derivative Complaint

including $153,553 in 2017.  His large Company stock holding, worth over $514,549 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  As a trusted and long-time director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Defendant Giles signed, and thus personally made the false and misleading statements in, the 2017 10-K referenced herein.  For these reasons, too, Defendant Giles breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

102.    Additional reasons that demand on Defendant Stevens is futile follow. Defendant Stevens has served as a Company director since June 2011, and serves as a member of the Audit Committee, the Compensation Committee, and the Nominating and Governance Committee.  He receives handsome compensation, including $138,053 in 2017.  His large Company stock holding, worth over $166,043 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted and long-time director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate

Verified Shareholder Derivative Complaint

assets.  Defendant Stevens signed, and thus personally made the false and misleading statements in, the 2017 10-K referenced herein.  For these reasons, too, Defendant Stevens breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

103.   Additional reasons that demand on the Board is futile follow.

104.   Demand in this case is excused because the Directors, all of whom are named as defendants in this action, control the Company and are beholden to each other. Moreover, the Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

105.   In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

106.    Ampio has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Ampio any part of the damages Ampio suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

107.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

108.    The acts complained of herein constitute violations of fiduciary duties owed by Ampio's officers and directors, and these acts are incapable of ratification.

109.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Ampio. If there is a directors' and officers' liability insurance policy covering the Directors, it

may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Ampio, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

110.    If there is no directors' and officers' liability insurance, then the Directors will not cause Ampio to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

111.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against the Individual Defendants for Breach of Fiduciary Duties**

112.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

Verified Shareholder Derivative Complaint

113.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ampio's business and affairs.

114.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

115.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Ampio.

116.    In breach of their fiduciary duties owed to Ampio, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) as a single trial, the AP-003-A study alone does not appear to provide sufficient evidence of effectiveness to support a BLA; (2) the Company's AP-003-C trial was not adequate and well-controlled to a level that would satisfy FDA standards; (3) the Company's two pivotal Ampion clinical trials were not successfully completed; and (4) Ampio failed to maintain internal controls.

117.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material

fact, rendering them personally liable to the Company for breaching their fiduciary duties.

118.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

119.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Ampio's securities.

120.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or

recklessly and for the purpose and effect of artificially inflating the price of Ampio's securities.

121.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

122.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Ampio has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

123.   Plaintiff on behalf of Ampio has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

124.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

125.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Ampio.

126.   The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Ampio that was tied to the performance or artificially inflated valuation of Ampio,

or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

127.    Plaintiff, as a shareholder and a representative of Ampio, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

128.    Plaintiff on behalf of Ampio has no adequate remedy at law.

### THIRD CLAIM

### Against Individual Defendants for Abuse of Control

129.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

130.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Ampio, for which they are legally responsible.

131.    As a direct and proximate result of the Individual Defendants' abuse of control, Ampio has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Ampio has sustained and continues to sustain significant damages.  As a

Verified Shareholder Derivative Complaint

result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

132.    Plaintiff on behalf of Ampio has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

133.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

134.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Ampio in a manner consistent with the operations of a publicly-held corporation.

135.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Ampio has sustained and will continue to sustain significant damages.

136.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

137.    Plaintiff on behalf of Ampio has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

138.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

139.   The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

140.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Ampio to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

141.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

142.   Plaintiff on behalf of Ampio has no adequate remedy at law.

### REQUEST FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Ampio, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Ampio;

(c)   Determining and awarding to Ampio the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants,

jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Ampio and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Ampio and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Ampio to nominate at least three candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Ampio restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

///

///

Verified Shareholder Derivative Complaint

1

          (g)    Granting such other and further relief as the Court may deem just

2

and proper.

3

4    Dated: September 10, 2018            Respectfully submitted,

5                                         **THE BROWN LAW FIRM, P.C.**

6
                                          s/ Robert C. Moest
7                                         Robert C. Moest, Of Counsel, SBN 62166
                                          2530 Wilshire Boulevard, Second Floor
8                                         Santa Monica, California 90403
                                          Telephone: (310) 915-6628
9                                         Facsimile: (310) 915-9897
                                          Email: RMoest@aol.com
10

11                                        **THE BROWN LAW FIRM, P.C.**
                                          Timothy W. Brown
12                                        240 Townsend Square
                                          Oyster Bay, NY 11771
13                                        Telephone: (516) 922-5427
                                          Facsimile: (516) 344-6204
14                                        Email: tbrown@thebrownlawfirm.net

15

16
                                          *Counsel for Plaintiff*
17

18

19

20

21

22

23

24

25

26

27

28

Verified Shareholder Derivative Complaint

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: September 10, 2018                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

s/ Robert C. Moest
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

VERIFICATION

I, Zac Cetrone am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this   th day of September 2018.

9/7/2018 6:18:02 PM PDT

DocuSigned by:

A6817E9E9E7D419...

Zac Cetrone